**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **MAINSTREET BANK** | \| |
| **Plaintiff,** | \| |
| | \| |
| **vs.** | \|   **Civil Action No.  1:10-cv-01230** |
| | \|                                  **[TSE-JFA]** |
| **NATIONAL EXCAVATING CORPORATION,** | \| |
| *et al.* | \| |
| **Defendants.** | \| |

**MAINSTREET BANK'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, MainStreet Bank ("MainStreet"), by counsel, hereby submits this Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Defendants' Motion").

**STATEMENT OF DISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56(B), MainStreet contends that the following facts asserted by Defendants are disputed:[1]

1.      MainStreet disputes the materiality of the loan amount – $8 million – proposed by National Excavating Corporation ("NEC").  *See* Memorandum in Support of Defendants' Motion for Summary Judgment [hereinafter "Def. Mem."], Def. Material Facts ¶ 8 [hereinafter "Def. Facts"].  McCammon recommended that MainStreet loan $3.2 million to NEC, *not* $8 million. *See* Defendants' Exhibit 19 [hereinafter "Def. Ex."], Credit Memorandum ("Credit Mem.").

2.      MainStreet disputes Defendants' characterization of MainStreet's bonus structure. *See* Def. Facts ¶ 8.  Factors in addition to loan originations are considered in determining whether and how much to award, including, but not limited to, the loan officer's portfolio management, ability to keep files current on an ongoing basis, and ability to ensure commercial

---

[1]  MainStreet generally disputes and objects to the characterization of those facts and the one-sided perspective with which Defendants present those facts.

relationships with borrowers.  *See* **Pl. Ex. 1**, Jeff Dick Declaration ("Dick Decl."), ¶ 14.

### A.   MainStreet Exercised Appropriate Due Diligence in Analyzing and Underwriting the Loan to NEC.

3.      MainStreet disputes the characterization that it failed to exercise due diligence

and was negligent in its analysis and underwriting of the loan to NEC: *See* Def. Facts ¶ 10.

a.      McCammon sought an explanation from William B. Finagin, Jr. ("Finagin")

regarding the decline in NEC's revenue and cash flow.  *See* Def. Ex. 13, April 24, 2009 E-mail

from McCammon to Jim West ("April 24 McCammon E-mail").  Forwarding information from

Finagin, Jeff Fabre ("Fabre") of Dynasty Capital Advisors, Inc. ("Dynasty") replied[2] that the

decline in revenue and cash flow resulted from losses incurred because of mismanagement by

National Wrecking Corporation's ("NWC") minority shareholder and "the legal and accounting

cost associated with removing him and cleaning up the mess he left."[3]  **Pl. Ex. 3**, April 24, 2009

E-mail from Fabre to McCammon ("Fabre E-mail").  Additionally, Fabre told McCammon that

MainStreet's analysis failed to make adjustments "to remove non-recurring expenses, or to bring

Bill's compensation in line with what he intends to take in the future.  These are material

changes that have a positive effect on cash flow."  *Id.*

b.      MainStreet expressed concerns regarding NEC's "dwindling" backlog.  *See* Def.

Ex. 13, April 24 McCammon E-mail.  Fabre explained that the decline was the result of NEC

"intentionally scaling down operations, moving from larger low-profit jobs to smaller high-profit

jobs.  As it became more selective in contracts it accepted, and as the larger jobs were completed,

the dollar amount of backlogs declined."  See **Pl. Ex. 3**, Fabre E-mail.  Additionally, after

---

[2] As with the large majority of e-mails in this case that contain material facts, Finagin was copied on this e-mail and never disputed any of the information conveyed on his behalf by his agents.

[3] Finagin claimed that almost $600,000 in lost revenue was directly attributable to the "mis/lack of management" of the minority shareholder.  *See* **Pl. Ex. 2,** February 18, 2009 E-mail.

reviewing the same information, Value Driven determined that there would be increased revenues from 2008-2009.  *See* **Pl. Ex. 4**, Value Driven Report, at p. 41.

> c.      MainStreet was told that there "[was] plenty of work available and [that Finagin] continues to be selective in the contracts he accepts."  *See* **Pl. Ex. 3**, Fabre E-mail.

> **B.      Defendants Mischaracterize the Information Provided to, Reviewed by and Relied on by MainStreet.**[4]

> 4.      MainStreet disputes Defendants' suggestion that it analyzed, underwrote and approved the loan without seeking or reviewing any financial information from 2009.  *See* Def. Facts ¶¶ 11, 19.  To the contrary, the following 2009 financial information was reviewed, analyzed and summarized in the Credit Mem.:  the Profit and Loss Comparison from First Quarter 2008 and 2009 ("P&L Comparison"); and the May 4, 2009 e-mail regarding NEC's work pipeline.  *See* Def. Ex. 19, Credit Mem., at p. 3; **Pl. Ex. 5**, Jeff Day Deposition Transcript ("Day Dep."), at 64:2-21; 129:12-132:18; **Pl. Ex. 6**, P&L Comparison.  This information revealed that NEC's profits had declined by only 1% and that NEC had "recently won four additional contracts totaling $4.6 million . . .  In addition the borrower anticipates contracts with 90% or greater chances of winning totaling $5.56 million and an additional $16.58 million for contracts between 80% and 89% chance of winning."  Def. Ex. 19, Credit Mem., p. 6; **Pl. Ex. 1**, Dick Decl. at 8; **Pl. Ex. 5**, Day Dep., at 129:12-17.  Given these facts, it is wholly inaccurate to suggest that MainStreet never reviewed 2009 financial information.

> 5.      MainStreet disputes Defendants' assertions that the value of the collateral pledged

---

[4] MainStreet also disputes Defendants' mischaracterization of the role of Jeff Dick, Tom Chmelik, Drew Brown and members of the OLC in underwriting this loan.  Contrary to what Defendants suggest (*see, e.g.* Def. Ex. 6, Dick Deposition 243:12-245:9; Def Ex. 3, Chmelik Dep. 123:7-22) it is not custom or practice in the banking industry for senior bank officers (*i.e.*, members of the OLC or similar body) to be involved in the details of the underwriting of loans, such as what specific information was reviewed and requested with respect to a particular borrower.  *See* **Pl. Ex. 1**, Dick Decl. at ¶ 13.

exceeded the amount of the loan.  *See* Def. Facts ¶¶ 14, 15, 24.  MainStreet underwrote the loan

based on 100% collateral coverage at liquidation value and knew that the liquidation value was

insufficient if a default occurred in the near term.  *See* Def. Ex. 19, Credit Mem., at p. 4.  It did

so based on a number of factors:  the strength of the company's history, finances, and profit

margins over time, and the fact that the rigorous amortization schedule would put MainStreet at

100% coverage at liquidation value within six months.  *See* **Pl. Ex. 1**, Dick Decl. at ¶¶ 6, 7.

6.      Defendants' allegation that there was no discussion of NEC "jobs in progress" in

the Credit Mem. while technically correct, is misleading.[5]  *See* Def. Facts ¶¶ 16, 19.  The Credit

Mem. specifically references NEC's dwindling backlog, but, pursuant to Finagin's

representations, attributed the backlog to NEC's scaled back operations, resulting in fewer but

more profitable jobs.  *See* Def. Ex. 19, Credit Mem., at p. 5.  Thus, while the OLC may not have

been aware of the specific number of "jobs in progress", it was aware that NEC had fewer jobs

than it had in the past and relied on Finagin's representations that the dwindling backlog was

attributable to a change in the structure of NEC's business.  *See* **Pl. Ex. 1**, Dick Decl. at ¶ 9.

7.      Defendants mischaracterize the financial information relied on by the OLC in

considering the NEC loan.  *See* Def. Facts ¶ 19.  The Credit Mem. included as attachments:

detailed balance sheet information, a detailed income statement, a detailed Uniform Credit

Analysis Cash Flow, and Ratios for NWC and NEC from 2003 through the Fourth Quarter of

2008.  *See* Def. Ex. 19, Credit Mem.; **Pl. Ex. 5**, Day Dep., at p. 26:5-28:12.

---

[5]  Also misleading is Defendants' summary of Drew Brown's testimony which suggests that
McCammon did not tell members of the OLC that NEC had only two jobs in progress.  *See* Def.
Facts ¶ 16, n.2.  Brown testified that he did *not recall* whether McCammon had shared the
information with him and that he *did not know* whether McCammon had shared the information
with other members of the OLC.  *See* Def. Ex. 2, Drew Brown Deposition at 260:18-267:7.

**C.**    **Defendants Mischaracterize the Parties' Actions Following the Loan Closing.**

8.    MainStreet disputes that NEC made the first two payments under the loan terms. *See* Def. Facts ¶ 25.  The loan terms required NEC to make its loan payment on the 18th of every month.  *See* Def. Ex. 28, Loan Booking Form.  The first payment, due on July 18, was not made until July 27.[6]  See **Pl. Ex. 8**, July 31 MainStreet Statement.  When Finagin told McCammon that NEC could not make the August payment, McCammon convinced him to advance sufficient money to NEC to make its second, and final, payment on August 28.  *See* **Pl. Ex. 10**, Thomas McCammon Declaration ("McCammon Decl.") at ¶ 8, 9, 10; **Pl. Ex. 9**, Finagin Dep., at 298:6-10; **Pl. Ex. 1**, Dick Decl. at ¶ 11.

9.    MainStreet disputes Defendants' assertion that MainStreet's refusal to allow a sale of equipment prevented NEC from making a loan payment.  *See* Def. Facts. ¶¶ 26, 27.  Upon request, MainStreet gave Finagin permission to sell equipment at auction on September 30, 2009.  *See* **Pl. Ex. 11**, September 25, 2009 E-mail.  However, the auctioneer informed Finagin that he could not sell the NEC equipment because there was "inadequate time to properly investigate any and all liens on equipment consigned to the sale." *See* **Pl. Ex. 12**, September 29, 2009 E-mail.  Thus, it was *not* MainStreet's actions that prevented the loan payment from being made.

10.    MainStreet disputes Defendants' insinuation that it summarily confessed judgment and seized and sold NEC's equipment and machinery at the first sign of default.  *See* Def. Facts ¶ 28.  MainStreet agreed that Finagin could loan NEC money and be reimbursed through NEC's account receivables.  *See* **Pl. Ex. 13**, August 27, 2009 E-mail.  From October

---

[6] On July 10, 2009, NEC's combined checking account balance dropped to less than $44,000. *See* **Pl. Ex. 7**, SunTrust Bank Free Checking Account Statement ("SunTrust Statement"), July 31, 2009; **Pl. Ex. 8,** MainStreet Bank Checking Account Statement ("MainStreet Statement"), July 31, 2009; **Pl. Ex. 9**, Finagin Deposition Transcript ("Finagin Dep."), at 282:8-283:2.  The balance did not rise above the amount needed for the loan payment until July 24, 2009.  *See* **Pl. Ex. 7**, July 31 SunTrust Statement; **Pl. Ex. 8**, July 31 MainStreet Statement.

through early December, 2009, MainStreet spoke with Finagin by phone, communicated with him by e-mail, and met with him at least twice.  *See* **Pl. Ex. 1**, Dick Decl. at ¶ 12.  MainStreet did not confess judgment until it became clear that the parties would be unable to reach an agreement.  *See* **Pl. Ex. 14**, December 1, 2009 E-mail (noting Finagin's rejection of work-out proposal); **Pl. Ex. 15**, Confession of Judgment.  The bulk of NEC's equipment and machinery was not sold before June 2010.  *See* **Pl. Ex. 16**, Ritchie Bros. Auctioneers (America) Inc. Auction Settlement Statements, June 18 and September 9, 2009.

> **D.**   **Finagin Misrepresented and Omitted Facts that Were Material To and Relied Upon by MainStreet in its Decision to Loan $3 Million to NEC.**

11.   MainStreet disputes Defendants' allegations that the information provided by Finagin to MainStreet was neither fraudulent nor misleading.  *See* Def. Facts ¶¶ 29, 31, 32.

a.   Prior to closing, Finagin did not tell MainStreet that NEC had started no new projects.  *See* **Pl. Ex. 9**, Finagin Dep., at 298:14-301:13; 303:1-304:2 (admitting that he did not recall telling anyone at MainStreet that NEC had not started any new projects).  Furthermore, through his agents, Finagin continued to assure MainStreet that "there [was] plenty of work available and [that he] *continues* to be selective in the contracts he accepts.  *See* **Pl. Ex. 3**, Fabre E-mail.  However, Finagin was *not* accepting contracts, because, unbeknownst to MainStreet, there was no work to be had.  Just 33 days after the loan closed, Finagin informed Smith that NEC's business had stalled, that work on hand was nearly complete, that NEC "had not started a new project in months," and that "he had never seen it this dry."  *See* **Pl. Ex. 17**, July 27, 2009 E-mail ("July 27 Finagin E-mail").  It is not credible for Finagin to assert that he was not aware of this at the time of and prior to the closing.  MainStreet relied on Finagin's representations that NEC continued to be awarded contracts and had plenty of work available and would not have closed on the loan had it known that NEC's work had dried up.  *See* **Pl. Ex. 1**, Dick Decl. at ¶ 10.

b.     The Bill of Sale provided to MainStreet misrepresented the assets that were transferred from NWC to NEC.[7]

i.     The Bill of Sale stated that "All of the Equipment of the Seller" was being transferred, however, the equipment that was transferred was *not* all of NWC's equipment nor did it include all of the equipment appraised by CDI.  *See* **Pl. Ex. 9**, Finagin Dep., at 209:5-210:1; 214:9-21.  McCammon believed that Exhibit A to the Bill of Sale contained "all" of NWC's equipment based upon his prior communications with Finagin and Finagin's agents and the fact that the Bill of Sale stated that "All the Equipment of [NWC]" was included in the purchase.  *See* **Pl. Ex. 10**, McCammon Decl. at ¶ 5.  Furthermore, despite an e-mail from McCammon on May 21, 2009 stating that NWC could only be removed as a party to the loan if MainStreet received sufficient confirmation that "all of the assets of NWC have been transferred to NEC" (*see* **Pl. Ex. 19**, May 21, 2009 E-mail), Finagin never contacted McCammon (nor does he recall that he asked his agents to contact McCammon) to tell him that he did not plan to transfer "all" of NWC's assets.  *See* **Pl. Ex. 10**, McCammon Decl. at ¶ 6, 7; **Pl. Ex. 9**, Finagin Dep., at 206:5-207:3.

ii.     G. Rogers Smith, President of Dynasty ("Smith"), disputes Finagin's allegation that Finagin told Smith that not all of NWC's assets were to be transferred.  *Compare* **Pl. Ex. 9**, Finagin Dep., at 194:21-195:21 *with* **Pl. Ex. 20**, G. Rogers Smith Deposition Transcript ("Smith Dep."), at 112:17-113:2.  In fact, Smith would have stopped the transaction had he known this fact because:  "if you don't transfer the assets of a corporation, you're going -- assuming the assets are productive assets, you're going to hinder the cash flow of the corporation and you're

---

[7] Though this sale allegedly took place on May 1, 2009, the Bill of Sale was not forwarded to MainStreet until late in the afternoon on June 18, 2009, the day originally scheduled for closing. *See* **Pl. Ex. 18**, June 18, 2009 E-mail and attached Bill of Sale.

going to set up a company to fail in the beginning." *See* **Pl. Ex. 20**, Smith Dep., at170:15-23.

E.     **Defendants Misstate Plaintiff's Fraud Claims Against Finagin and NWC.**[8]

12.     Plaintiff's fraud claims against Finagin are threefold:

a.     First, "all" of the assets of NWC were not transferred.  Regardless of the terminology, MainStreet understood that *all* of NWC's assets would be *transferred* prior to the closing.  McCammon stated:  "NWC is still a party to the loan.  Our approval was written with them as maker, and given that I am not in receipt of documentation at the time of issuance stating affirmatively *that all of the assets of NWC have been transferred to NEC*, I must protect the banks' right to the collateral." *See* **Pl. Ex. 19**, May 21, 2009 E-mail (emphasis added).[9]

b.     Second, Finagin repeatedly assured MainStreet and other participants to the negotiations that no material adverse change had occurred with respect to NEC's finances.

i.     The Commitment Letter contained a requirement that there would be "no material adverse change in the borrower's financial condition or prospects, or in the condition of any security, between the date hereof and the Closing Date." *See* **Pl. Ex. 21**, May 28, 2009 Commitment Letter, at p.8.[10]  By signing the letter, Finagin undertook an obligation to inform MainStreet of *any* material adverse change in NEC's "financial condition or prospects."  *Id.* Despite the fact that he testified in his deposition that he knew prior to closing that NEC had not started a new project in months, Finagin did not disclose this fact at any time prior to July 27,

---

[8] *See* Def. Facts XIV.

[9] Furthermore, Finagin's own agents understood that the assets of the two companies were to be combined:  "When we did the financial analysis, we combined the assets of the two companies. . . . Whether that combination was through a merger or a transfer of assets or dissolution of the sister company -- the form of that combination I don't know… I do know that our analyses were relying on the fact that we've got two sister companies that we are combining as one." *See* **Pl. Ex. 20**, Smith Dep., at 166:24-167:10; 90:24-92:11; 94:12-95:3.

[10]  When the loan amount changed just prior to closing, a new commitment letter with the same requirement was signed on June 18, 2009.  **Pl. Ex. 22**, June 18, 2009 Commitment Letter, at p. 7.

2009.  *See* **Pl. Ex. 9**, Finagin Dep., at 300:4-301:13.

      ii.     Less than four weeks after the loan closed, NEC had insufficient funds in its bank accounts to make its first loan payment.  *See* Plaintiff's Disputed Facts [hereinafter "Pl. Disp. Facts"] ¶ 8 n.6.  Such a shortfall did not occur overnight, and it is simply incredible to suggest that Finagin did not know prior to or at the time of closing that NEC would be unable to satisfy its payment obligations under the loan.[11]

      iii.     In response to every concern raised by MainStreet, Finagin continually reassured MainStreet that NEC's finances were in good shape.  *See* Pl. Disp. Facts ¶¶ 3.a.-c., 4.

      iv.     Finagin's representation to Value Driven that no material adverse change had occurred with respect to NEC's finances was key to Value Driven's June 18, 2009 Letter ("Carry Forward Letter"), and this letter was a condition of the closing.  *See* **Pl. Ex. 23**, June 18, 2009 Value Driven Letter; *see* **Pl. Ex. 24**, Jeff Dick Deposition ("Dick Dep."), at 143:20-144:20.  The President of Value Driven, Tracy Lamb ("Lamb"), testified that the purpose of the Carry Forward Letter was to affirm that NEC was still worth $10.2 million on the date of the closing.  *See* **Pl. Ex. 25**, Tracy Lamb Deposition ("Lamb Dep."), at 67:16-72:5.  In order to execute the Carry Forward Letter, Lamb testified that "in addition to discussing all of this with [Finagin], I also asked him to provide me with a statement that nothing had changed materially since my valuation date."  *Id*. at 70:2-5.  Lamb also testified that she "wouldn't have just taken [Finagin's statement] and based my opinion solely on that, but it supported everything that we had talked about. . ."  *Id*. at 70:24-71:5.

      c.     Third, MainStreet alleges that Finagin misrepresented NEC's prospects by

---

[11] Tellingly, Smith, who was to serve as the ESOP trustee, was not told that NEC had insufficient work in progress at the time of closing to make its payments on the MainStreet loan or to meet its other obligations after the loan closed.  *See* **Pl. Ex. 20**, Smith Dep. at 138:19-139:20.

affirmatively representing in the Pipeline E-mail that NEC had 26 jobs in the pipeline, including four that had been awarded at a total of over $4.5 million.  Dynasty forwarded the Pipeline E-mail to MainStreet, copying Finagin, and an analysis of the information was included in the Credit Mem. submitted to the OLC just three days later.  *See* Def. Ex. 32, Pipeline E-mail; *see also* Def. Ex. 19, Credit Mem., at p. 7.  One of Finagin's agents, Glenn Cunningham ("Cunningham"), forwarded a spreadsheet to McCammon containing Finagin's representation regarding the probability that the outstanding projects would be awarded to NEC.  *See* **Pl. Ex. 26**, May 5, 2009 E-mail and attachment.[12]  Cunningham also told McCammon that the awarded projects were expected to begin within 30 days.  *See* **Pl. Ex. 28**, May 4, 2009, 9:19 AM E-mail (MSB6516).  While Tracy Lamb stated in her deposition that she did not rely on the numbers assigned to the value of the contracts themselves, she relied on them as "support [for Finagin's] expectations of expected growth."  *See* **Pl. Ex. 25**, Lamb Dep., at 59:17-60:8.

## ADDITIONAL UNDISPUTED FACTS

MainStreet asserts the following additional facts in opposition to Defendants' Motion:

1.      Based on information provided by NEC and Finagin, Dynasty produced a study regarding whether an ESOP transaction was feasible for NEC, concluding that it was and estimating in December 2008 that NEC was worth $11.42 million.  *See* Def. Ex. 11, Dynasty Funding Request and Proposal.  This study assumed that "National Wrecking Corporation will become a subsidiary of National Excavating.  The data used in this report consolidates the reporting from National Excavating and National Wrecking."  *Id*. at p. 6.  Dynasty brokered the transaction from initial proposal to closing, often acting as Finagin's agent and as an

---

[12] The handwritten probabilities had been faxed to Cunningham from NEC earlier that day.  *See* **Pl. Ex. 27**, Fax from NEC.  A side by side comparison of the two documents reveals that the percentages listed on the spreadsheet are a typed version of the information contained on the fax.

intermediary between Finagin and MainStreet.  *See* **Pl. Ex. 10**, McCammon Decl. at ¶ 11.

2.      McCammon relied on information conveyed to him by Smith, Fabre, West and Cunningham and believed them to be Finagin's agents because they typically responded to his requests for information.  Finagin was regularly copied on their communications to McCammon and never disputed or contradicted the information they conveyed to him.  *See id.* at ¶ 12.

3.      On March 30, 2008, MainStreet issued a term sheet which was then signed by Finagin.  *See* **Pl. Ex. 29**, Term Sheet.  NEC and NWC were listed as co-borrowers.  *Id.*

4.      One of the loan conditions was that an independent valuation be conducted.  *See* Def. Ex. 19, Credit Mem. at p. 7; *see also* **Pl. Ex. 25**, Lamb Dep., at 88:22-89:8 ("I knew that there would be a bank looking at my valuation report and relying on it, I would assume, to some degree.").  The Value Driven Report was based on Finagin's representations that NEC and NWC were to be combined:  (i) "National Excavating Corporation and its sister company, National Wrecking Corporation, will be combined into one corporate entity prior to the ESOP transaction.  Therefore, financial statements for each company were analyzed and combined in this analysis"; (ii) "As previously indicated, all the assets and liabilities of National Wrecking will be transferred to National Excavating prior to the ESOP transaction"; and (iii) the valuation was based, *inter alia*, on a "lengthy interview with Mr. William Finagin on April 22, 2009."  *See* **Pl. Ex. 4**, Value Driven Report, at 4, 5; **Pl. Ex. 25**, Lamb Dep., at 45:8-46:19; 60:9-61:23. MainStreet received the Value Driven Report on May 13, 2009.  *See id.*

5.      In its initial stages, the loan was structured with NWC as a co-borrower.  *See* **Pl. Ex. 30**, March 23, 2009 E-mail.  On May 21, 2009, West told McCammon that NWC would not be involved in the loan and that "[t]he assets of National Wrecking are being transferred to NEC which will render NWC a shell.  The intent is to bifurcate the lawsuit liabilities away from the operating company.  [Finagin] will retain NWC for his personal use and absorb any liability from

the lawsuits." *See* **Pl. Ex. 19**, May 21, 2009 10:27 am E-mail.  MainStreet proposed that NWC

remain involved in the loan as an unconditional guarantor, a proposal that Finagin rejected by

changing NWC's status to conditional guarantor.  *See* **Pl. Ex. 31**, May 22, 2009 E-mail and

attached Draft Commitment Letter, at 3(I).  By the closing date, Finagin had completely removed

NWC from any involvement in the loan.  *See* **Pl. Ex. 22**, June 18, 2009 Commitment Letter.

6.      Similarly, though there were initial discussions that Finagin would participate in

the transaction as a guarantor, *see* **Pl. Ex. 32**, Draft Term Sheet, he ultimately distanced himself

from the transaction, participating only as NEC's president, and choosing not to be involved in

the transaction in any personal capacity (except for a pledge of real property owned by him).  *See*

Def. Ex. 35, April 21, 2009 E-mail (noting no principal guaranty); *see* **Pl. Ex. 33,** James A. West

Deposition, at 82:5 ("[Finagin] didn't want any personal guarantees").

7.      On April 30, 2009, NEC's SunTrust Account was debited in the amount of

$150,000.00 due to a check to NWC.  *See* **Pl. Ex. 34**, April 30, 2009 SunTrust Statement.

8.      On May 20, 2009, NEC opened a checking account at MainStreet with an initial

deposit of $50,000.00.  *See* **Pl. Ex. 35**, May 29, 2009 MainStreet Statement.

9.      On May 31, 2009, the SunTrust Account had a balance of $427,126.71.  *See* **Pl.**

**Ex. 36**, May 31, 2009 SunTrust Statement.

10.     On June 15, 2009, Finagin wrote a check from NEC's SunTrust Account in the

amount of $361,039.09 for closing costs.  *See* **Pl. Ex. 37**, June 30, 2009 SunTrust Statement.

11.     On June 24, 2009, the date of closing, the combined balance of NEC's checking

accounts was $153,353.47.  *See id.*; **Pl. Ex. 38**, June 30, 2009 MainStreet Statement

12.     As part of the ESOP transaction, Finagin took a note in the amount of $7 million

from NEC in exchange for the pledge of his NEC stock.  *See* **Pl. Ex. 39**, ESOP Note.

13.     Of the $3 million loaned by MainStreet to NEC, $2.25 million went directly and

immediately to Finagin.  The remainder, $750,000.00 was initially pledged to a bonding

company to obtain the release of a lien but was later released directly to Finagin.  *See* **Pl. Ex. 9**,

Finagin Dep., at 246:17-248:17.  Thus, the entire $3,000,000.00 ultimately went to Finagin.

     14.    On June 28, 2009, NEC's SunTrust Account was debited in the amount of

$50,000.00 as the result of a check to NWC.  *See* **Pl. Ex. 37**, June 30, 2009 SunTrust Statement.

     15.    On June 30, 2009 the combined balance of NEC's checking accounts was

$74,280.72.  *See id.*; **Pl. Ex. 38,** June 30, 2009 MainStreet Statement.

     16.    On July 27, 2009, McCammon e-mailed Finagin regarding NEC's past due loan

payment and notifying Finagin that NEC's failure to use its MainStreet business checking

account as its main operating account was "an event of default."  *See* **Pl. Ex. 40**, July 27, 2009

McCammon E-mail.

     17.    On July 31, 2009, the combined balance of NEC's checking accounts was

$17,156.82.  *See* **Pl. Ex. 7**, July 31, 2009 SunTrust Statement; **Pl. Ex. 8**, July 31, 2009

MainStreet Statement.

     18.    By August 31, 2009, the combined balance of NEC's checking accounts was less

than $8,500.00 due to checks and withdrawals authorized by Finagin, by far the largest of which

was an $83,333.33 check written to himself from the MainStreet Account on August 12.  *See* **Pl.

Ex. 41**, August 31, 2009 SunTrust Statement; **Pl. Ex. 42**, August 31, 2009 MainStreet Statement.

## ARGUMENT

## I. <u>Standard of Review</u>

     Summary judgment "is not to be lightly granted."  *Southern Fed. Savs. & Loan v.

Fellows*, 22 B.R. 40, 41 (Bankr. E.D. Va. 1982).  Summary judgment should be granted only if

the evidence presented "show[s] that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996). The party seeking summary judgment has the burden to show the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "[S]ummary judgment . . . may not be invoked where . . . the affidavits present conflicting versions of the facts which require credibility determinations." *See Davis v. Zahradnick*, 600 F.2d 458, 460 (4th Cir. 1979); *iCore Networks, Inc. v. McQuade Brennan LLP*, 2009 U.S. Dist. LEXIS 147 (E.D. Va. Jan. 5, 2009) (Cacheris, J.).

In contrast, the burden on the nonmoving party is light. *Southern Federal*, 22 B.R. at 41; *see also Wasson v. Media General, Inc.*, 446 F. Supp. 2d 579, 589 (E.D. Va. 2006) (Payne, J.) (explaining that "[t]he plaintiff, to survive the defendant's motion, need only present evidence from which a jury *might* return a verdict in his favor") (emphasis added). "In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.), *cert. denied*, 513 U.S. 813 (1994); *Wasson*, 446 F. Supp. at 588. Moreover,

> the nonmoving party is entitled to have the credibility of [its] evidence as forecast assumed, [its] version of all that is in dispute accepted, all internal conflicts in it resolved favorably to [it], the most favorable of possible alternative inferences drawn from it drawn in [its] behalf; and finally, to be given the benefit of all favorable legal theories invoked by the evidence so considered.

*Mid-Atlantic Waterproofing Corp. v. MCI Telecomm. Corp.*, 1993 U.S. App. LEXIS 23403, *7 (4th Cir. Sept. 13, 1993). Particularly when issues of credibility or intent are at issue, summary judgment is inappropriate and the facts must be construed in favor of the non-moving party. *Anderson*, 477 U.S. at 255; *see Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007); *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990).

## II.   <u>Choice of Law</u>

Seeking a redress for the fraud of Finagin and NWC, neither of who were parties to the

loan, MainStreet filed this tort action.  Both Maryland and Virginia apply the law of *lex loci*

*delicti*, thus the law of the place of wrong, Maryland, shall govern this dispute.  Though

Defendants attempt to confuse the issue with a discussion of forum selection clauses, the fact that

NWC and Finagin deliberately distanced themselves from the transaction prohibits them from

benefitting from any forum selection clauses in the agreements between NEC and MainStreet.

> **A.    The forum selection clauses in the Note and Security Agreement cited by Defendants do not apply to the current dispute**.

Defendants assert that that this Court should apply Virginia law[13] because the forum

selection clauses in the Secured Credit Agreement and the Note call for the application of

Virginia law.[14]  This fact is unavailing to the Defendants, however, because this action is not an

action based on or arising from the Note or the Secured Credit Agreement.  This action does not

seek to enforce these documents or any other loan document.  Instead, this action concerns

Finagin's misrepresentations and NEC's fraudulent conveyances to Finagin.

Additionally, the forum selection clause quoted by Defendants specifically states that the

party subject to the forum selection clause is NEC:  "*NEC* shall 'submit to the exclusive

jurisdiction of any Virginia state court or federal court sitting in the Commonwealth of Virginia

---

[13] In transferring this matter to Virginia, Judge Williams held that Finagin was entitled to enforce the forum selection clause in the Security Agreement.  *See* memorandum opinion dated Oct. 28, 2010 at 7 [Doc. No. 18].  This Court is not bound by this ruling:  "It may sometimes be proper for a district judge to treat earlier rulings as binding, sometimes not."  *Hill v. BASF Wyandotte Corp.*, 696 F.2d 287, 290 (4th Cir. 1982).  Thus, this Court may and should examine choice of law anew because evidence uncovered during discovery provides additional context to the negotiations regarding and execution of the agreements cited by Defendants.

[14] The documents related to the transaction are not of one voice:  some select Virginia law and some select Maryland law.  *Compare* Def. Ex. 16, Secured Credit Agreement § 6.6., at 14 ("This Credit Agreement and the Note shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia...") *with* **Pl. Ex. 43**, ESOP Loan Agreement § 7.4, at 7-8 ("[T]his Agreement and all rights and obligations hereunder, including matters of construction, validity, performance and existence, shall be governed by the substantive laws of Maryland...").

with respect to any suit, action or proceeding relating to this Note.'" Def. Mem. at p. 18 (quoting the Note) (emphasis added). The documents cited by Defendants do not require that a lawsuit seeking relief from third parties and centering on actions of third parties be brought in Virginia. Furthermore, courts are reluctant to allow an entity not a party to a contract to enforce a forum selection clause. "A forum selection clause is a bargained-for term in a contract between the contracting parties, and for that reason it may not, in most instances, be enforced by one who is not a party to the contract." *America Online, Inc. v. Huang*, 106 F. Supp. 2d 848, 857 n.26 (E.D. Va. 2000) (Ellis, J.); *see also Belfiore v. Summit Fed. Credit Union*, 452 F. Supp. 2d 629, 633 (D. Md. 2006) (holding that a non-party can enforce the forum selection clause only if "their alleged conduct is closely related to the contract").

Defendants cite only one case, *Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614 (4th Cir. 1999), in support of their argument that the forum selection clauses should control the choice of law in this action. *Hitachi* involved a breach of fraud and contract suit between two parties to a contract. *Id*. at 619. In considering the application of the forum selection clause, the Court stated that it would apply to Hitachi's "contract-related" tort claims in order to "honor[] the intent of the parties to choose the applicable law." *Id*. at 628.

*Hitachi* is inapplicable to this case for a number of reasons. First, this case does *not* involve a dispute between two contracting parties. Second, the plaintiff in *Hitachi* sued both for fraud *and* breach of contract. *Id*. at 628. Here MainStreet has sued only in tort because there is not contractual relationship between the parties. Finally, whether the parties to the loan, NEC and MainStreet, intended the forum selection clause to apply to disputes between the parties regarding contract-related tort claims is of no consequence to a suit involving tort claims between non-contracting parties. In fact, *Hitachi* never addressed the threshold choice of law issue in this case: whether non-parties such as NWC and Finagin can enforce a forum selection

16

clause in a contract.  As discussed above, it is only in unusual circumstances when a non-party to the contract may enforce a forum selection clause.

Furthermore, not only were NWC and Finagin *not* parties to the contract, but both took actions to ensure that they were not associated with the contract.  From the initial negotiations to the time of closing, Finagin diminished both his and NWC's role in the transaction to the point that neither had any liability under the loan.  *See* Pl. Facts., at ¶¶ 5, 6.  Perhaps the best statement of Finagin and NWC's desire to distance themselves from the transaction can be found in Finagin's own words:  "NWC and I *have no obligation or responsibilities* under the NEC ESOT with MainStreet.  Therefore, NWC and I will not provide any of the requested information."  *See* **Pl. Ex. 44**, October 21, 2009 Letter.  Given Finagin and NWC's conscious and deliberate actions to distance themselves from the loan, they should be estopped from enforcing the forum selection clause in a contract under which they clearly believed they had "no obligations or responsibilities."

### B.    Because the forum selection clauses in the Note and Security Agreement do not apply, the law of the place of the wrong, Maryland, applies.

Both Virginia and Maryland apply the principle *lex loci delicti* to tort claims such as those in this case.  *See Dreher v. Budget Rent-A-Car Sys., Inc.*, 272 Va. 390, 395, 634 S.E.2d 324, 327 (2006), *and compare Phillip Morris, Inc. v. Angeletti*, 752 A.2d 200, 230-31, 233 n. 28 (Md. 2000).  Both states define the place of wrong as where "'the last event necessary to make an act liable for an alleged tort takes place.'"  *Quillen v. Int'l Playtex. Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986) (*quoting Miller v. Holiday Inns, Inc.*, 436 F.Supp. 460, 462 (E.D. Va. 1977) (Widener, J.)); *see also Hilb Rogal & Hobbs Co. v. Rick Strategy Partners, Inc.*, 2006 U.S. Dist. LEXIS 96056, 16-18 (E.D. Va. Feb. 10, 2006) (Payne, J.); *Philip Morris*, 752 A.2d at 231 ("The place of injury is also referred to as the place where the last act required to complete the tort

occurred."); *see also First Union Nat'l Bank v. New York Life Ins. & Annuity Corp.*, 152 F. Supp. 2d 850, 854 (D. Md. 2001) ("The place of injury has been further defined as the place where the last act required to complete the tort occurred.").  Maryland state courts have not specifically addressed where the "last act" occurs in a fraud claim. *Sensormatic Sec. Corp. v. Sensormatic Elec. Corp.*, 455 F. Supp. 399, 425 n. 22 (D. Md. 2006).  The United States District Court for the District of Maryland has, however, considered the question and determined that it "'must apply the rule which it reasonably believes would be adopted by the highest Maryland court were it to rule on the question.'"  *Cremi v. Brown*, 955 F. Supp. 499 (D. Md. 1997) (quoting *Uppgren v. Exec. Aviation Serv., Inc.*, 326 F. Supp. 709, 711 (D. Md. 1971).  The *Cremi* court determined that the law of the state where the misrepresentation occurred, Texas, was the law that would be applied, not the state where the injury was felt, Maryland.  *Cremi*, 955 F. Supp. at 524.

As to the fraud claims, Finagin's misrepresentations to MainStreet, in the form of his failure to disclose any material adverse changes in the financial condition of NEC, should be treated as having occurred in Maryland.  *See Cremi v. Brown*, 955 F. Supp. at 524 n. 79 ("by their nature omissions may not necessarily occur in any particular jurisdiction -- though they may be treated as having occurred in the place where the alleged wrongdoer conducted his business.").  Second, the execution of the Bill of Sale which represented that "all of the equipment" of NWC was being transferred to NEC militates in favor of the application of Maryland law.  Though it was executed in the District of Columbia, the parties involved in the transaction were, as the Bill of Sale notes, Maryland corporations.  Third, the conveyances between NEC and Finagin which ultimately turned NEC into an empty shell occurred between two Maryland entities, Finagin and NEC.  Finally, MainStreet's collections efforts against NEC have occurred in Maryland, so the shortfall in recovering funds has arisen in Maryland.  *See* **Pl. Ex. 45**, Trustee's Suggested Accounting; **Pl. Ex. 46**, April 13, 2011 Order of the Circuit Court

for Prince George's County, Maryland, ratifying Report of Auditor.

While Maryland courts have not specifically considered the question of choice of law with respect to fraudulent conveyance, a Virginia federal court decision provided guidance on the issue in its determination that fraudulent conveyance claims "will therefore be treated as sounding in tort for choice of law purposes." *Terry v. June*, 420 F. Supp. 2d 493, 503 (W.D. Va. 2006). Applying this approach to this matter compels the application of Maryland law: all of the entities were Maryland citizens and all of the property involved in the fraudulent conveyances was located in Maryland. Applying all of the forgoing precedent to the case at bar, Maryland law should apply both to MainStreet's fraudulent conveyance and fraud claims.

**III. Finagin caused NEC to Fraudulently Convey $3 Million to Him in Exchange for Inadequate Consideration - His Stock in NEC. (Counts One – Four).**

Defendants' memorandum contains only a cursory discussion of MainStreet's fraudulent conveyance claims, dismissing them offhand as inapplicable due to Defendants' choice of law conclusions and contending that, even if the claims withstand a choice of law discussion, they are not cognizable as MainStreet received adequate consideration for the loan. *See* Def. Mem., at p. 21. This argument misunderstands MainStreet's fraudulent conveyance claims and misstates the applicable law. The question is not whether MainStreet received adequate consideration in the form of collateral – which it did not (*see* Pl. Disp. Facts, at ¶ 9) – but whether NEC received sufficient consideration for its transfer of $3,000,000 to Finagin. It is uncontested that MainStreet loaned three million dollars to NEC, all of which was then conveyed to Finagin in exchange for his stock in the company (which he transferred to the NEC ESOT), an entity that was essentially insolvent and unable to pay the obligations owed to its creditors, including MainStreet, less than four weeks after the loan closed.

**A.    Finagin divested his stock to NEC, in exchange for $3 million, to defraud NEC's creditors and personally profit from a company that was no longer a going concern, satisfying the requirements of Md. Comm. L. Code Ann. §§ 15-207 and 15-206.  (Counts One and Four).**

Count One alleges a fraudulent conveyance in violation of Md. Comm. L. Code Ann § 15-207 and common law.  The elements of such a claim are a debt to a creditor, a conveyance or obligation, and "actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud… creditors."  Count Four, which alleges an invalid conveyance by a person about to incur debts in violation of Md. Comm. L. Code Ann. § 15-206 and common law, has very similar elements:  a conveyance or obligation, a lack of fair consideration, and an intent or belief by the person who makes the conveyance or who enters into the obligation that he will incur debts beyond his ability to pay as they mature.  The critical difference between the two statutes is that § 15-206 does not require proof of intent to defraud.

Finagin testified that he knew at the time of the loan closing and stock transfer that NEC had not started any new jobs.  *See* Pl. Disp. Facts, at 11.a.  Additionally, he knew or should have known that as a result of the $150,000.00 paid to NWC and the check written for $361,039.00 in closing costs, NEC had only $153,353.47 in its checking accounts, insufficient funds to satisfy NEC's obligations.  *See* Pl. Facts ¶¶ 7, 10, 11.  In this case, all of the required elements of § 15-207 are present, including the insolvency or indebtedness of NEC, a very large and direct financial motive for Finagin, and a particularly close relationship between NEC and Finagin in which Finagin was (as the sole shareholder, director, and President) completely in control of NEC.  *See, e.g.*, *Berger v. Hi-Gear Tire & Auto Supply, Inc.*, 263 A.2d 507, 510 (Md. 1970) (quoting with approval 37 AM.JUR.2D, *Fraudulent Conveyances*, § 10 (1968)); 37 AM. JUR. 2D, *Fraudulent Conveyances and Transfers* § 14 (West Group 2010).

**B.      NEC became insolvent as a result of its payment of $3 million to Finagin, who gave in exchange only his (worthless) NEC stock.  (Count Two).**

Count Two alleges an invalid conveyance by an insolvent person in violation of Md. Comm. L. Code Ann. § 15-204 and common law.  The elements of such a claim are a debt to a creditor, a conveyance or obligation, insolvency (either before or as a result of the conveyance or obligation) of the person making the conveyance or incurring the obligation, and lack of a fair consideration.  As the statute explicitly states, actual intent to defraud is *not* required.

Insolvency is defined as:  "[a] person is insolvent if the present fair market value of his assets is less than the amount required to pay his probable liability on his existing debts as they become absolute and matured." *See* Md. Comm. L. Code Ann. § 15-202(a).  Notably, "the burden of proving the solvency of the debtor, that is, that he retained sufficient means to pay his debts after the voluntary conveyance, is on the transferee" – Finagin.  *Damazo v. Wahby*, 305 A.2d 138, 143 (Md. 1973) (quoting *Lacey v. Van Royen*, 267 A. 2d 91 (Md. 1970)).  It is significant that NEC was unable to make even its first loan payment on time, was unable, on its own, to make the second payment, and made no other payments beyond the first two.

Finally, the only consideration given for the conveyance of the $3 million to Finagin and the additional $7 million obligation was Finagin's NEC stock, which was transferred to the NEC ESOT.  The value of the stock of a company that cannot pay its bills for more than a month, and whose financial condition was as described by Finagin in his July 27 e-mail, is "disproportionately small as compared to" $10 million.  Md. Comm. L. Code Ann. § 15-203(2).

**C.      The conveyances to Finagin and NWC were fraudulent pursuant to § 15-205. (Count Two).**

Count Three alleges an invalid conveyance by a person in business in violation of Md. Comm. L. Code Ann. § 15-205 and common law.  The elements of such a claim are a debt to a creditor, a conveyance or obligation, lack of fair consideration, and that the person making the

conveyance or obligation be engaged or about to engage in a business or transaction for which his remaining property after the conveyance is an unreasonably small capital.

Again, the only consideration given for the conveyance of the $3 million in cash and the additional $7 million obligation to Finagin was Finagin's NEC stock. NEC's almost immediate business collapse after making only one payment on the MainStreet loan on its own, the substantial deficiency existing after MainStreet Bank's collections activities (Pl. Disp. Facts ¶¶ 8, 9; **Pl. Ex. 45**, Trustee's Suggested Accounting), and NEC's apparent inability to make even a single full payment on its obligation to Finagin (*see* Answer of Finagin [Docket no. 22] ¶ 32) are sufficient factual material to show at this stage that NEC retained unreasonably small capital to continue to engage in its excavation business after its conveyance and obligation to Finagin. Indeed, the ESOP transaction, the NWC equipment sale, and Finagin's post-loan withdrawals from NEC's accounts show a pattern not of leaving NEC with adequate capital to carry on its business but rather of draining NEC of cash in favor of Finagin and his other company, NWC. Whether or not MainStreet received adequate consideration for the making the loan, which MainStreet disputes, is immaterial.

IV.    **Finagin's Fraud and Misrepresentations about the true state of NEC's finances and prospects were relied upon by MainStreet to its detriment.** (Counts Five and Six).

Maryland applies a five factor test to claims of fraud: 1) the defendant made a false representation to the plaintiff, (2) the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth, (3) the misrepresentation was made for the purpose of defrauding the plaintiff, (4) the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) the plaintiff suffered compensable injury as a result of the misrepresentation. *Hoffman v. Stamper*, 867 A.2d 276, 292 (Md. 2005). The inquiry for fraud in Virginia is very similar and correctly stated by Defendants. *See* Def.

Mem. at p. 22 (citing *Hitachi*, 166 F.3d at 628).  Fraud and constructive fraud/negligent

misrepresentation require very similar elements.  *See* Def. Mem. at p. 22; *see also Gross v.*

*Sussex*, 630 A.2d 1156, 1161 n.7 (Md. 1993) ("Fraud and negligent misrepresentation share

common elements.").  Both states recognize that "[t]he misrepresentation element of the tort of

fraud may be based on an affirmative misrepresentation of fact; a concealment of fact, which

includes a partially misleading disclosure; or a non-disclosure of fact in the face of a duty to

disclose.  *Hoffman v. Stamper*, 843 A.2d 153, 186 (Md. Ct. Spec. App. 2004) (*rev'd on other*

*grounds,* 867 A.2d 276 (Md. 2005)); *Hitachi*, 166 F.3d at 629 (concealing or omitting a material

fact, "may also give rise to a claim of actual fraud."); *see also Copper v. Berkshire Life Inc. Co*.,

810 A.2d 1045, 1062 (Md. Ct. Spec. App. 2002) ("even in the absence of a duty of disclosure,

one who suppresses or conceals facts which materially qualify representations made to another

may be guilty of fraud.") (quoting *Finch v. Hughes Aircraft Co*., 469 A.2d 867, 891 (Md. Ct.

Spec. App. 1984)).  Under the law of both states, Finagin's actions were fraudulent.

> **A.  Finagin knowingly and/or with reckless indifference misrepresented material**
> **facts intended to induce MainStreet to loan $3 million to NEC.**

When MainStreet inquired into what appeared to be NEC's declining financial health,

Finagin, through his agents, responded with information that he knew or should have known was

inaccurate.  First, Finagin attributed the decline in revenue and cash flow to:  a) non-recurring

expenses as the result of losses incurred by the mismanagement of the minority partner; b)

Finagin's plan to take less compensation in the future; and c) a change in the company's

structure from larger low-profit jobs to smaller high-profit jobs.  *See* Pl. Disp. Facts., at ¶ 3.a.-c.

Additionally, MainStreet was told that there was "plenty of work available" and that "[Finagin]

continues to be selective in the contracts he accepts."  *Id*.  These representations were made to

MainStreet on April 24, 2009, exactly two months prior to closing, and were directly contrary to

Finagin's July 27, 2009 e-mail , in which he stated:  "We have not started a new project *for*

*months* and the work on hand is practically complete.  There are not many dollars to bill going

forward with out [*sic*] new starts.  I have never seen it this dry."  *See* **Pl. Ex. 17**, July 27, 2009

Finagin E-mail (emphasis added).  It is undisputed that as of the date of the closing Finagin knew

that NEC had not started any new projects and thus that there were minimal accounts receivable

(*see* Pl. Disp. Facts, at ¶ 11.a.), yet he never corrected the statements made on his behalf by

Fabre.  Therefore, NEC's finances were not declining as a result of the reasons explained by

Fabre, but rather because NEC had *no work*, a fact that was never shared with MainStreet.

   Second, Finagin materially misrepresented NEC's future prospects by transmitting the

Pipeline E-mail on May 4, 2009, which contained information that he had just been awarded four

jobs with a combined value in excess of $4.6 million.  *See* Def. Facts, at ¶¶ 31, 32.  Additionally,

in an e-mail on which Finagin was copied, Cunningham forwarded to MainStreet a spreadsheet

setting forth the likelihood that each outstanding project would be awarded to NEC.  See Pl.

Disp. Facts, at ¶ 12.c.  This spreadsheet concluded that NEC had a 90% or higher chance of

winning additional jobs in the amount of $5.56 million, information that was included in the

Credit Mem. and relied upon by the OLC in approving the loan.  *See* Pl. Disp. Facts ¶¶ 4, 12.c.;

Def. Ex. 19, Credit Mem., at p. 6.  Both MainStreet and Value Driven believed this information

to be indicative of the strength of NEC's future prospects.  *See* Def. Ex. 8, Lamb Dep.; Def. Ex.

19, Credit Mem. at p. 6 (explaining that despite the appearance of a declining backlog, NEC

recently won four contracts and NEC reported a high probability to win more).

   Third, Finagin falsely represented that there had been no material adverse changes in

NEC's finances.  This misrepresentation occurred in two forms.  First, Finagin warranted that

there had been no material adverse changes in NEC's financial conditions or prospects by

signing the Commitment Letters.  *See* Pl. Disp. Facts, at ¶ 12.b.i.  Second, in Finagin's

communications with Tracy Lamb and his endorsement of the "Statement of No Material Adverse Change" which caused Value Driven to issue its Carry Forward Letter stating that the value of the company had not changed from December 31, 2008 to June 18, 2009. *See id.* at ¶ 12.b.iv. The facts unquestionably show that Finagin's representations to Value Driven (on whose report MainStreet relied) and MainStreet were false. NEC had $427,126.71 in liquid assets on May 31, 2009. *See* Pl. Facts, at ¶ 8. By June 15, 2009, NEC's liquid assets were less than $100,000.00. *See* **Pl. Ex. 37**, June 30, 2009 SunTrust Statement; **Pl. Ex. 38** June 30, 2009 MainStreet Statement. Furthermore, by Finagin's own account, NEC had not started any new projects in months, which would necessarily encompass the time period covered by his representations to Value Driven and MainStreet. *See* Pl. Disp. Facts, at ¶ 12.b.i.

Finally, Finagin and his agents repeatedly represented that "all" of the assets of NWC and NEC would be combined prior to the closing. *See id.* at ¶ 13.b. From the initial Offering Memorandum (*see* Def. Ex. 11) to Finagin's signature on the Term Sheet which indicated that the companies were to be co-borrowers (*see* **Pl. Ex. 29**, Term Sheet) to the combined NEC and NWC financial statements that were forwarded to MainStreet by Finagin's accountant on April 21 (*see* Def. Ex. 14) to the independent valuation produced by Value Driven and forwarded to MainStreet on May 13 (*see* **Pl. Ex. 4**) to the May 21, 2009 e-mail exchange between West and McCammon stating that the assets of NWC were to be transferred to NEC leaving NWC a "shell" (*see* Pl. Facts, ¶ 4) it was continually represented to MainStreet that the assets of NWC, including the accounts receivable, would be transferred to NEC. In fact, when MainStreet finally received the Bill of Sale late in the day on June 18, 2009, it stated that "All of the Equipment" of NWC was being transferred to NEC. *See* Def. Ex. 23. Based upon his prior communications with Bill Finagin and his agents and the fact that language of the Bill of Sale stated that "All the Equipment of [NWC]" was included in the purchase, McCammon believed that Exhibit A to the

Bill of Sale contained the same list of equipment that had been appraised by CDI.  *See* **Pl. Ex. 47**, Thomas McCammon Deposition, at 190:14-191:19; **Pl. Ex. 10**, McCammon Decl., at ¶ 5.

> ### B.  MainStreet reasonably relied upon Finagin's misrepresentations regarding the current projects, NEC's pipeline of work, the overall financial health of NEC, and the transfer of equipment from NWC to NEC.

In claiming that Plaintiff's reliance on Finagin's fraudulent statements was not reasonable, Defendants rely heavily upon the Fourth Circuit's decision in *Hitachi*, *supra*.  *See* Def. Mem. at 25-26.  Defendants claim that MainStreet was negligent in failing to discover Finagin's fraud.  Quoting at length from the *Hitachi* court's discussion of two Virginia Supreme Court decisions regarding a prudent investigation, *see id.* at 26, Defendants omit a key sentence following the quoted language:  "The cases in Virginia are clear . . . that 'one cannot, by fraud and deceit, induce another to enter into a contract to his disadvantage, then escape liability by saying that the party to whom the misrepresentation was made was negligent in failing to learn the truth.'"  *Hitachi*, 166 F.3d at 629 (quoting *Nationwide Ins. Co. v. Patterson*, 229 Va. 627, 630, 331 S.E.2d 490, 492 (1985)).  Indeed, the *Hitachi* court actually reversed the District Court's grant of summary judgment on the plaintiff's fraud claims on the basis that the plaintiff "was reasonable and justified" in relying on the defendant's misrepresentations and omissions because, like MainStreet here, the plaintiff had attempted to investigate.  *Id.* at 630.

The principle enunciated in *Hitachi*, that a fraudulent party cannot assert negligence against the plaintiff, is well-rooted in both Virginia and Maryland precedent.  *See Cerriglio v. Pettit*, 113 Va. 533, 75 S.E. 303 (1912); *Scarborough v. Atlantic C. L. R. Co.*, 190 F.2d 935, 939 (4th Cir. 1951) ("it was never any credit to the law to allow one who had defrauded another to defend on the ground that this own word should not have been believed.") (citing Maryland law); *Standard Motor Co. v. Peltzer*, 128 A. 451, 453 (Md. 1925) (finding plaintiff justified in relying on defendants' misrepresentations despite his opportunity to inspect and discover the truth

because defendants could not escape liability for their misrepresentations by asserting plaintiff

negligent).  The Maryland Court of Appeals has explicitly reversed a lower court's grant of

summary judgment to the defendant based on the theory that "'[t]he person who claims to have

been defrauded must also have no reasonable opportunity to verify the truth or falsity of the

representation. Where the party has an opportunity to learn the facts he has no right to rely on

representations, the truth of which he has equal means of ascertaining or by the exercise of

reasonable diligence could have ascertained.' **Maryland Law is otherwise**." *Gross v. Sussex*,

Inc., 630 A.2d 1156, 1165 (Md. 1993) (emphasis added).

In *Cerriglio*, the Virginia Supreme Court addressed alleged fraudulent statements

concerning the value of property.  The defendant had claimed that a property he was selling in

Pittsburgh, PA "was worth $35,000 . . . had a loan value of $16,000 – *i.e.*, that the latter amount

could be borrowed upon it – and . . . a rental value of $125 per month." *Id.* at 536, 75 S.E. at

304.  The plaintiff had never been to Pittsburgh prior to the sale.  *Id.*  The Court rejected the

defendant's contention that his statements as to value were mere "trade talk" and that the

plaintiff should have conducted additional research into the value of the property:

> The weight of authority does not sanction the doctrine that one who has
> fraudulently deceived another, and thereby induced him to enter into a contract to
> his disadvantage, can successfully defend an appropriate action against him for
> the fraud and deceit by saying, "It is true that I, by fraud and deceit, induced you
> to enter into the contract, but you were negligent in not finding out that I was
> deceiving you, and, therefore, guilty of negligence in believing me."

*Id.* at 544, 75 S.E. at 308.  The Court further elaborated that "'[o]ne to whom a representation

has been made is entitled to rely on it *quoad* the maker, and need make no further inquiry.'" *Id*

(quoting *Lowe v. Trundle*, 78 Va. 65 (1888)).

More recent Virginia decisions reinforce the holding in *Cerriglio*.  *See Nationwide Ins.*

*Co. v. Patterson*, 229 Va. 627, 630, 331 S.E.2d 490, 492 (1985) ("Nationwide also argues that

Patterson cannot recover because he had available the means of acquiring the correct information about the meaning of the policy. . . . [I]n Virginia, one cannot, by fraud and deceit, induce another to enter into a contract to his disadvantage, then escape liability by saying that the party to whom the misrepresentation was made was negligent in failing to learn the truth" (citing *Cerriglio*)); *Rowland v. State Farm Fire & Cas. Co.*, 64 Va. Cir. 16, 18 (Fairfax Cir. Ct. 2003) (denying summary judgment under the rule in *Cerriglio* and noting that "[i]t is not for this Court, at this preliminary stage in the litigation to evaluate the quality of Rowland's proof or to search for evidence of contributory negligence. These are facts that should be established at trial").[15]

MainStreet, as is prudent for any bank contemplating a loan, thoroughly investigated the proposed transaction prior to agreeing to fund the loan. At the outset, Finagin's agents forwarded a valuation that estimated the value of the combined assets of NEC and NWC at $11.2 million. *See* Pl. Facts, at ¶ 1. After reviewing this valuation, MainStreet reviewed and analyzed all of the financial statements made available to it, including the Combined NEC-NWC 2008 year end financials supplied by Finagin's accountant on April 21, 2009. *See* Def. Ex. 14. After reviewing this most recent financial statement, MainStreet returned to Finagin with a number of very specific questions regarding cash flow, revenue decrease and a dwindling pipeline. *See* Pl. Disp. Facts, at ¶ 3.a.-c.; Def. Ex. 13; **Pl. Ex. 3**, Fabre E-mail. To borrow the language of *Horner*, on April 24, 2009, Finagin and his agents began a process of "diversion" that would last until

---

[15]  The Virginia case of *Horner v. Ahern*, 207 Va. 860, 153 S.E.2d 216 (1967), cited by *Hitachi*, actually reinforces this principle. As the *Horner* Court explained:

> [T]here is a very important exception to the rule that a purchaser is bound to discover the true condition for himself if he has information which would excite the suspicions of a reasonably prudent man. That exception is that the vendor must not say or do anything to throw the purchaser off his guard or divert him from making the inquiries and examination which a prudent man ought to make.

*Id.* at 864, 153 S.E.2d at 219. Thus, affirmative misrepresentations – such as the fraudulent statements in this case – vitiate the defense of imprudent investigation.

July 2009, when MainStreet realized that NEC did not have the funds to make even one timely payment on its debt to MainStreet.

MainStreet expressed detailed concerns regarding declines in revenue and cash flow. Def. Ex. 13. In response, Finagin's agent provided a seemingly reasonable explanation for those declines, even including spreadsheets, to support the conclusion that with the problems of the minority shareholder behind Finagin and a new business model of taking on larger low-profit jobs, NEC continued to be a strong company. *See* **Pl. Ex. 3**, Fabre E-mail. This conclusion was further supported by the 2008 / 2009 Profit & Loss Comparison which showed that NEC's profitability was only down 1%. *See* Pl. Disp. Facts, at ¶ 4. Additionally, Finagin and his agents forwarded the series of "Pipeline e-mails" to MainStreet less than ten days later, which showed that NEC had won four additional contracts totaling 4.6 million with a very high probability of winning bids for a number of other high dollar contracts with representations that work was to begin within 30 days. *See id.* at ¶¶ 5, 14.c. This information provided sufficient answers to the concerns of MainStreet, and the transaction was presented to the OLC on May 7, 2009. *See* Def. Ex. 19, Credit Mem. MainStreet relied on Finagin's representations that NEC continued to be awarded contracts and had plenty of work available and would not have closed on the loan had it known that NEC's work had dried up. *See* **Pl. Ex. 1**, Dick Decl, at ¶ 10.

When MainStreet asked for confirmation that "all" of NWC's assets had been transferred to NEC, Finagin supplied such confirmation in the form of the Bill of Sale which stated that "all" of the equipment of NWC had been transferred. *See* Def. Ex. 23. Had the Bill of Sale stated that anything less than all would be transferred, that a "portion" of NWC's assets would be transferred or even simply, that "the following assets of the Seller are being transferred," MainStreet would have been put on notice that, contrary to all earlier representations, NWC was not transferring all of its assets. *See* **Pl. Ex. 10**, McCammon Decl., at ¶ 5. However, as

explained by the court in *Horner*, Finagin "divert[ed MainStreet] from making the inquiries and examination which a prudent man ought to make" and he cannot now attempt to distance himself from his fraud by alleging MainStreet's negligence.

Defendants claim that MainStreet's reliance on this information was misplaced, that it should have looked behind the information and questioned Finagin in detail about its meaning, even securing copies of the awarded contracts for its review.  Def. Mem. p. 27.  Yet, as with all the information supplied by Finagin and his agents, MainStreet had no reason to doubt its accuracy, and the law places no obligation on MainStreet to seek additional information when its investigation has yielded satisfactory answers.  MainStreet had no "information which would excite the suspicions of a reasonably prudent man."  *See Horner*, 270 Va. at 864, 153 S.E.2d at 219.  Instead, Defendants are attempting to shift the burden for their own fraudulent actions onto MainStreet, something the law does not permit.

## CONCLUSION

For the reasons stated above and for those to be articulated at the hearing, there are genuine issues of material fact which preclude the entry of summary judgment.  Accordingly, Defendants' motion should be denied and MainStreet should be allowed its day in court.

Respectfully submitted,

/s/ Heather H. Lockerman

Richard E. Hagerty (VSB # 47673)          Heather H. Lockerman (VSB# 65535)
*Attorney for MainStreet Bank*            Joshua D. Heslinga (VSB # 73036)
Troutman Sanders LLP                      *Attorneys for MainStreet Bank*
1660 International Drive, Suite 600        Troutman Sanders LLP
McLean, Virginia 22102                    1001 Haxall Point
(703) 734-4326                            P.O. Box 1122
(703) 448-6520 (fax)                      Richmond, Virginia  23218-1122
richard.hagerty@troutmansanders.com       Telephone:  (804) 697-1277
                                          Facsimile:  (804) 698-6047
                                          heather.lockerman@troutmansanders.com
                                          joshua.heslinga@troutmansanders.com

2046581v6