IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MAINSTREET BANK,                          )
    Plaintiff,                              )
                                            )
        v.                             )       Case No. 1:10cv1230
                                            )
NATIONAL EXCAVATING                       )
CORPORATION, et. al.,                     )
    Defendants.                             )

## MEMORANDUM OPINION

At issue in this transferred[1] diversity action alleging fraud and fraudulent conveyances arising out of a leveraged employee buyout is whether plaintiff's claims survive summary judgment. Defendants essentially argue that plaintiff's claims fail for two reasons. First, defendants argue that Virginia law governs plaintiff's claims, and hence plaintiff's statutory fraudulent conveyance claims under Maryland law must be dismissed. Second, defendants argue that the common law actual and constructive fraud claims fail because the undisputed facts on summary judgment demonstrate that no fraud occurred.

For the reasons that follow, because Virginia law governs, summary judgment must be granted in favor of defendants on the Maryland statutory fraudulent conveyance claims but denied as to the common law actual and constructive fraud claims.

---

[1] MainStreet filed its original complaint on August 3, 2010 in the United States District Court for the District of Maryland. On October 28, 2010, an Order issued transferring the matter to this jurisdiction based on several factors including the fact that closing on the transaction in question occurred in Arlington, Virginia. *See MainStreet Bank v. National Excavating Corp.*, No. 10cv2116 (D. Md. Oct. 28, 2010).

I.[2]

Plaintiff MainStreet Bank ("MainStreet"), a community bank chartered in Virginia,

brought this action against five defendants: (i) National Wrecking Corp. ("NWC"), (ii) National

Excavating Corp. ("NEC"), (iii) National Excavating Corp. Employee Stock Ownership Trust

("NEC ESOT"), (iv) William Finagin, Jr., and (v) G. Rogers Smith in his capacity as trustee of

NEC ESOT.[3]  NWC and NEC are corporations primarily engaged in the excavating business,

and both corporations were at one time majority-owned by Finagin.

Finagin founded NEC in November 2007 with the intent to make NEC a successor to

NWC.  After NEC came into existence, NWC continued work on various projects but did not bid

on new projects.  NWC transferred several projects to NEC and also leased some, but not all of

its equipment to NEC.  In or around October 2008, Dynasty Capital Advisors ("Dynasty")

represented to Finagin that Dynasty could sell Finagin's interest in NEC to the employees of

NEC in a leveraged employee buyout through an employee stock ownership plan.

A leveraged employee buyout generally proceeds in three stages.  First, the company

establishes an employee stock ownership trust.  Next, the trust borrows money from a lender to

purchase the existing owner's shares of the company, thus transferring ownership of the

company to the trust.  This allows the existing owner to "cash out" of the company.  The

company then uses cash from its operating income to purchase the shares from the trust.  As the

company acquires its shares, it redistributes them to the company's employees.  The cash paid to

---

[2] All facts recited here are undisputed unless otherwise stated, and where any disputes of fact are
noted, the analysis proceeds by assuming the version of the dispute most favorable to the non-
movant—in this case MainStreet. *See Sapphire Dev., LLC v. Span USA, Inc.*, 120 Fed. Appx.
466, 470 (4th Cir. 2005).

[3] The diversity of the parties is not in dispute.  Specifically, (i) MainStreet is a Virginia citizen;
(ii) NWC, NEC, and Finagin are Maryland citizens; (iii) Smith is a citizen of Louisiana; and (iv)
the citizenship of NEC ESOT is either Maryland or Louisiana.

the trust to acquire the shares can be used by the trust to make loan payments. Over time, all of the company's stock is transferred from the trust to the company's employees, and the lender is fully paid on the loan. When this process is complete, the trust is terminated.

After conducting a study of NEC, Dynasty concluded that (i) an employee stock ownership plan would be a feasible means of buying out Finagin, and (ii) that the value of a 100% interest in NEC was approximately $11.42 million. Value Driven LLC, a business valuation firm hired to conduct an independent valuation of NEC, calculated the value of NEC's stock to be approximately $10.2 million. Accordingly, under the terms of the buyout, NEC ESOT was created to purchase all of Finagin's shares in the company for approximately $10 million, with $3 million to be provided to Finagin in cash and the remaining $7 million in the form of a note to be paid to Finagin over seven years out of NEC's operating profit. NEC ESOT would obtain the $3 million in cash from NEC, which in turn would borrow the money from MainStreet on a promissory note. NEC's $3 million promissory note from MainStreet was to be secured by a portion of Finagin's real property and by all of NEC's assets.

On May 27, 2009, MainStreet provided a commitment letter describing the terms of the deal. That letter—signed by MainStreet, Finagin, NWC, and NEC[4]—states that the "agreements evidenced hereby, and the transactions contemplated hereby, shall be governed in all respects by the laws of the Commonwealth of Virginia." Commitment Letter at 11 (Pl. Ex. 21). At closing on June 24, 2009, which occurred in Virginia, MainStreet and NEC signed two documents, namely a secured credit agreement and a promissory note, as contemplated by the earlier

---

[4] Finagin signed both in his personal capacity and in his official capacity as an officer of NWC and NEC.

commitment letter.[5]  Both the secured credit agreement and promissory note contained choice of

law provisions selecting Virginia law.[6]

Although Finagin and NWC were not parties to the secured credit agreement or

promissory note, their role in the transaction was clearly referenced in those documents.  Indeed,

the secured credit agreement contained a covenant stating that the $3 million loan from

MainStreet to NEC must be used "exclusively to finance the [employee buyout] of employer

securities." Secured Credit Agmt. at 8 (Def. Ex. 16).  It is undisputed that the employer

securities in issue were Finagin's NEC shares.

The parties do not provide a pellucidly clear picture of how the $3 million was

transferred from MainStreet to Finagin.  Based on the wire transfers referenced in the parties'

memoranda, it appears that MainStreet first wired the $3 million to a closing attorney for the

transaction at the attorney's bank account located in the District of Columbia.  That attorney was

then instructed by NEC and Finagin to wire the money to the District of Columbia bank account

of Finagin's attorney, who thereafter transferred the money to Finagin's personal bank account in

Maryland.[7]

---

[5] The parties dispute whether the obligations under the commitment letter were extinguished by
the closing documents.  The closing documents do not contain a merger clause, but as discussed
*infra*, it is clear that the parties intended the closing documents to supplant any earlier
agreements memorialized in the commitment letter.

[6] The promissory note bound MainStreet and NEC to "submit to the exclusive jurisdiction of any
Virginia state court or federal court sitting in the Commonwealth of Virginia with respect to any
suit, action, or proceeding related to this Note."  Promissory Note at 5 (Defs. Ex. 15).  The
secured credit agreement provided that the secured credit agreement and the promissory note
"shall be governed by and construed in accordance with the laws of the Commonwealth of
Virginia." Secured Credit Agreement at 14 (Defs. Ex. 16).

[7] The record is not entirely clear about the precise point at which Finagin can be said to have
received the $3 million, given that the money was in his attorney's control when it was still in
the District of Columbia.  In any event, this fact, even if disputed, is not material to the analysis

4

The first payment to MainStreet on NEC's loan was due July 18, 2009. It was received late, on July 27. That same day, Finagin informed Dynasty,[8] which in turn notified MainStreet, that NEC's business had declined very significantly. NEC subsequently failed to make the second payment, which was due on August 18. On August 26, Finagin informed MainStreet that NEC lacked the necessary cash flow to make the August payment, but Finagin agreed, at MainStreet's request, to fulfill the loan payment using his personal funds. No further loan payments were made after that point. By November 3, NEC's checking account with MainStreet was virtually depleted.

MainStreet obtained a confessed judgment against NEC in the amount of $2,986,939.81 in Fairfax Circuit Court, Virginia. MainStreet then sold the NEC machinery and equipment in which it had taken a security interest for the loan, resulting in net proceeds of $565,702.66.[9] After foreclosing on NEC's secured equipment, machinery, and real estate, MainStreet contends that it is still owed approximately $1.5 million by NEC on the promissory note.

MainStreet brought this action for declaratory judgment and damages alleging four statutory fraudulent conveyance claims under Maryland law,[10] common law actual fraud, and common law constructive fraud. Distilled to its essence, MainStreet's amended complaint stems from three alleged wrongs: (i) that defendants committed fraud by falsely representing the financial condition of NEC and NWC; (ii) that defendants committed fraud by falsely representing that all of NWC's assets would be transferred to NEC prior to closing to

---

here.

[8] Although neither clear nor pertinent to the analysis herein, it appears that Dynasty acted as defendants' agent for some purposes.

[9] This figure is net of costs from the sale.

[10] Specifically, MainStreet asserts claims under Md. Code Comm. Law §§ 15-204, 205, 206, and 207. The distinctions between these statutory claims are not pertinent to the analysis here.

collateralize MainStreet's loan; and (iii) that NEC's transfer to Finagin of $3 million in cash and a $7 million promissory note in exchange for Finagin's NEC stock amounted to a fraudulent conveyance under Maryland statutory law, inasmuch as defendants were aware that the stock was worth far less than $10 million. MainStreet seeks (i) declaratory judgments that the conveyances from NEC to Finagin and the sale of assets from NWC to NEC were designed to defraud MainStreet, (ii) a personal judgment against Finagin for compensatory and punitive damages, and (iii) reasonable attorneys' fees and costs.

Finagin and NWC deny any wrongdoing and move for summary judgment. The remaining parties—NEC, NEC ESOT, and Smith—are in default but await ruling on the claims against Finagin and NWC before continuing with default judgment proceedings.

Because defendants seek summary judgment as to the fraud claims, a review of the record facts pertaining to the alleged misrepresentations is essential to the summary judgment analysis. According to MainStreet, the summary judgment record demonstrates, *inter alia*, two misrepresentations by defendants with respect to the buyout. First, MainStreet argues that defendants intentionally misled MainStreet into believing that all the assets of NWC would be transferred to NEC at or before closing.[11] In support of this contention, MainStreet cites email exchanges between MainStreet's loan officer and defendants' agents in which the loan officer repeatedly references his understanding that all assets would be transferred from NWC to NEC prior to closing. MainStreet's loan officer also provided a sworn declaration representing that, based on the sum of his communications with defendants, defendants intentionally led him to believe all assets would be transferred from NWC to NEC. Defendants respond that nowhere in

---

[11] Because MainStreet's $3 million loan to NEC was secured by NEC's assets, MainStreet contends that the failure to transfer certain assets from NWC to NEC as promised left MainStreet's loan under-collateralized.

6

the email exchanges do defendants or their agents explicitly state that all NWC assets would be transferred to NEC.  To the contrary, defendants claim that they provided MainStreet a bill of sale specifying the assets actually transferred to NEC.  Defendants further note that had MainStreet compared this bill of sale to previously submitted documents describing NWC's assets, MainStreet would have been on notice that not all NWC assets were transferred to NEC. In response, MainStreet points out that the bill of sale was not provided until the eve of closing and was intended only to serve as confirmation that the asset transfer was complete.  Given this, MainStreet argues that it was not reasonable to expect MainStreet to scrutinize the bill of sale and compare it to other financial documents.  The summary judgment record, viewed in a light most favorable to MainStreet, reflects that the email exchanges, the declaration from MainStreet's loan officer, and the bill of sale leave a genuine dispute of fact as to whether defendants represented that all assets would be transferred from NWC to NEC prior to closing.

For the second alleged misrepresentation, MainStreet contends that defendants misrepresented the financial state of NEC and NWC prior to closing.  In particular, although NEC had not started any new projects in the months prior to closing, defendants communicated to MainStreet in an email that there were several projects in the "pipeline" that had been "awarded" to NEC.  Although the parties do not dispute that NEC's business had stagnated several months before closing and never improved thereafter, defendants dispute the reasonableness of MainStreet's interpretation of the email referencing "awarded" projects. Defendants essentially contend that MainStreet did not ask to clarify the meaning of "awarded" projects, nor did MainStreet inquire as to the expected revenue from the projects listed; as such, defendants contend that MainStreet could not reasonably rely on the email as a representation of NEC's financial health.

7

## II.

Where, as here, the claims involve activities that cross state lines, the threshold question that must be resolved is the choice of governing law.  And here, because this case was transferred from the District of Maryland pursuant to 28 U.S.C. § 1404(a), the starting point in the analysis is the rule of *Van Dusen v. Barrack*, 376 U.S. 612 (1964), requiring the transferee forum to apply the choice of laws rules of the transferor forum.  *Id.* at 632-37; *see also Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 599-600 (4th Cir. 2004) (same). Thus, Maryland's choice of law rules govern here.  In this respect, Maryland recognizes two choice of law rules pertinent to the analysis, each of which, by a distinct analytical path, leads in the end to the same result, namely that Virginia law governs plaintiff's tort claims, including the fraudulent conveyance claims found in Counts I-IV.  Because MainStreet's fraudulent conveyance claims were brought under Maryland statutes, the conclusion that Virginia governs compels dismissal of the Maryland statutory fraudulent conveyance claims.

The first of the pertinent Maryland choice of law rules is that "parties to a contract may agree as to the law which will govern their transaction." *Taylor v. Lotus Dev. Corp.*, 906 F. Supp. 290, 294 (D. Md. 1995).[12]  Although the closing documents, namely the secured credit agreement and promissory note, both contain choice of law provisions naming Virginia law as controlling, MainStreet points out that Finagin and NWC—the present movants—were not

---

[12] It is worth noting that Maryland law recognizes two exceptions to the rule that a contractual choice of law provision should be given effect, although, as the parties appropriately recognize, neither exception is applicable here.  First, the provision should not be enforced where the forum whose law is chosen bears "no substantial relationship to the parties or the transaction." *Taylor*, 906 F. Supp. at 294.  This exception does not apply here given MainStreet is a Virginia bank and closing occurred in Virginia.  Second, Maryland law provides that a choice of law provision should not be enforced where "the strong fundamental public policy of the forum state precludes the application of the choice of law provision." *Id.*  The parties cite no Maryland public policy— and none has been found—that would justify failing to enforce the choice of law provision in this context.

8

signatories on those contracts.  Thus, MainStreet argues that Finagin and NWC lack standing to enforce the choice of law provisions.  Finagin and NWC respond to this argument in two ways. First, they contend they do not need to rely on the choice of law provisions in the closing documents because the choice of law provision in the commitment letter, on which they were signatories, is fully binding on MainStreet.  Second, as to the choice of law provision in the closing documents themselves, Finagin and NWC argue that they were intended third party beneficiaries of the closing documents and thus have standing to enforce the choice of law provisions found therein.

As to the first argument concerning the commitment letter, it is true that the commitment letter contains a choice of law provision selecting Virginia law, and that NWC, Finagin, and MainStreet were all parties to that agreement.  Nevertheless, MainStreet argues that the commitment letter's obligations terminated at closing, such that the choice of law provision in that agreement is no longer enforceable.  As a general matter, when parties agree to enter a contract that is later formalized in a written agreement, prior stipulations and understandings are generally deemed merged in the final contracts. *See Rafferty v. Butler*, 133 Md. 430, 432 (1919) ("the written instrument is the final consummation of the contract and all conversations and stipulations between the parties preceding or accompanying the execution of it are to be regarded as merged in it").  But this principle, typically invoked to bar offers of parol evidence, is not dispositive here, as this is not such a case; rather, defendants here assert that the commitment letter represents a formal agreement that continues to govern the parties even after the closing documents were signed.

Nevertheless, MainStreet is correct that the choice of law provision in the commitment letter is no longer enforceable.  Although the closing documents do not contain an explicit

merger clause, it is quite plain from reading the commitment letter and the closing documents together that the closing documents were intended to supersede and extinguish any obligations in the commitment letter. The commitment letter merely memorialized a promise by MainStreet to provide NEC a credit facility at certain terms, a promise that was fulfilled at closing when the secured credit agreement was offered by MainStreet and accepted by NEC. Furthermore, the closing documents recite terms for the credit facility that overlap and augment the terms outlined in the commitment letter. If the commitment letter continued to govern after closing, reconciling the parties' obligations based on the overlapping contracts would be a difficult, if not impossible, task. In sum, it is clear that the parties intended the closing documents to encapsulate fully their obligations and to supersede the obligations set forth in the commitment letter. Thus, the choice of law provision in the commitment letter cannot be enforced by Finagin and NWC here.

Although NWC and Finagin cannot enforce the choice of law provision in the commitment letter, their argument that they are intended third party beneficiaries of the closing documents—and thus have standing to enforce the choice of law provisions found in those agreements—is persuasive. Generally speaking, a contract cannot be enforced by a nonparty unless that person is an intended third party beneficiary. *See Spates v. Spates*, 267 Md. 72, 77 (1972); *College of Notre Dame of Md., Inc. v. Morabito Consultants*, Inc., 132 Md. App. 158, 179 (Ct. Spec. App. 2000) (a third party who is only an "incidental" beneficiary acquires no rights in the contract). And it is well settled in Maryland that the "controlling issue" in determining whether a party is an intended third party beneficiary is "whether the contract's terms, in light of the surrounding circumstances, reveal an intent to make the promise to the third party in fact if not in form." *Thompson v. Witherspoon*, 197 Md. App. 69, 88 (Ct. Spec. App. 2011). For example, in *District Moving & Storage Co. v. Gardiner & Gardiner, Inc.*, 63 Md.

10

App. 96 (Ct. Spec. App. 1985), the Maryland Court of Special Appeals agreed that a lessee was

an intended third party beneficiary of contracts between an architect and a construction company.

The contracts called for the building of a storage warehouse facility, and at the time of signing,

the architect and the construction company were in agreement that the facility would be built for

the purpose of renting it to the lessee to use as a primary warehouse. *Id.* at 98, 102. The clear

recognition of the lessee's interest in the project at the time of signing supported the conclusion

that the lessee was an intended third party beneficiary. *Id.* By contrast, in *Hamilton & Spiegel,*

*Inc. v. Board of Education*, 233 Md. 196, 200 (1963), the Maryland Court of Appeals held that a

subcontractor was not an intended third party beneficiary of a public construction contract

between the Board of Education and the general contractor where a bond was posted to protect

the subcontractor. After noting that the bond was designed to ensure payment to subcontractors

who otherwise could not obtain a lien on the work done, the court held that the posting of the

bond "refute[d] the claim that the contract between the [Board of Education] and the prime

contractor intended to make suppliers or subcontractors beneficiaries" entitled to direct payment

from the Board. *Id.* at 200.

        The closing documents in this case make clear that NWC and Finagin—like the lessee in

*District Moving & Storage*—were intended third party beneficiaries of MainStreet's loan to

NEC. The closing documents explicitly require that NEC use the loan proceeds to complete the

buyout of "employer securities," namely Finagin's stock in NEC. Had NEC failed to use the $3

million to buy Finagin's shares, Finagin could have brought suit against NEC based on

covenants in the closing documents, despite the fact that he was not a signatory on those

documents. Moreover, it is of no moment that Finagin and NWC took steps to ensure that they

were not obligated under the closing documents to make any payments or otherwise guarantee

11

the debts of NEC to MainStreet. The fact that Finagin and NWC are not obligated to repay the

note to MainStreet has no bearing on whether they are intended third party beneficiaries of the

loan to NEC.[13] Because they were intended third party beneficiaries, they are entitled to the

protections of the choice of law provisions in the closing documents just as if they were

signatories.

MainStreet raises one additional consideration with respect to the contractual choice of

law provisions. Specifically, MainStreet contends that even if Finagin and NWC have standing

to enforce the choice of law provisions in the closing documents, the provisions themselves are

not broad enough to cover MainStreet's tort[14] claims for fraud and fraudulent conveyance. This

argument fails. It is well settled that where a choice of law clause in the contract is sufficiently

---

[13] The parties do not devote attention in their memoranda to distinguishing NWC's role in the buyout from Finagin's, nor do the parties offer an independent analysis of NWC's status as an intended third party beneficiary. Nevertheless, given that NWC and Finagin were inextricably intertwined together and in the transaction, it is appropriate to conclude that NWC is just as much an intended third party beneficiary as Finagin. Furthermore, given that any alleged fraudulent conveyances to NWC were done at Finagin's direction, it would make no sense—indeed, it would be an impossible feat of mental gymnastics—to apply one state's laws to Finagin's role in the fraudulent conveyances and another state's laws to NWC's role in the same conveyances. Just as one cannot distinguish two sides of a Möbius strip, it is impossible to distinguish where NWC's conduct ends and Finagin's begins. Accordingly, the conclusion that Virginia law applies to fraudulent conveyance claims against Finagin applies with equal force to the fraudulent conveyance claims against NWC.

[14] Although Maryland law is not clear on whether a fraudulent conveyance claim sounds in tort, it is reasonable to conclude, as the parties agree, that the character of a fraudulent conveyance claim is more closely aligned with tort law. As the Maryland Court of Appeals noted in *Wilmington Trust Co. v. Clark*, 289 Md. 313 (1981), an essential quality of a tort is that it arises from the breach of "a legal duty [not arising by contract] owed by the defendant to the plaintiff," because "[i]n the absence of [any] duty, there can be no recovery in tort." *Id.* at 327 (refusing to recognize an individual's suicide as a basis for a tort action by the decedent's former spouse against the decedent's estate). The duty in the fraudulent conveyance context is clear: a debtor owes a duty to a creditor not to convey assets to a third party if that conveyance leaves the debtor insolvent. Accordingly, given that the gravamen of the fraudulent conveyance claim is the wrongfulness of the conveyance and the injury to the creditor, rather than balancing equities or fairness, it is appropriate to conclude that fraudulent conveyance claims sound in tort.

12

broad to encompass contract-related tort claims, such as fraud or fraudulent inducement, courts have honored the parties' intent to have related tort claims covered by the choice of law provision in the contract. *See Sedghi v. PatchLink Corp.*, 2010 U.S. Dist. LEXIS 103698 (D. Md. Sept. 30, 2010) (applying Maryland choice of law rules); *accord Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999) (applying Virginia choice of law rules). For example, in *Hitachi*, the choice of law provision stated that Virginia law would govern interpretation of "this Agreement and the rights and obligations of the parties hereunder . . . including all matters of construction, validity and performance." 166 F.3d at 624. Given this broad language, and given "the close relationship of the tort claims to the contract," the Fourth Circuit concluded that "the parties intended [for the provision] to cover more than merely contract claims"; specifically, the choice of law provision was also held to cover the plaintiff's actual and constructive fraud claims. *Id.*

The same result obtains here. The choice of law provision in the promissory note required the parties to "submit to the exclusive jurisdiction of any Virginia state court or federal court sitting in the Commonwealth of Virginia with respect to any suit, action, or proceeding related to this Note." Promissory Note at 5 (Defs. Ex. 15). The reference to "any suit, action, or proceeding" is sufficiently broad to encompass MainStreet's fraud and fraudulent conveyance claims, which, as in *Hitachi*, bear a close relationship to the contracts in issue. Accordingly, because MainStreet brought its fraudulent conveyance claims solely under Maryland statutes, the Maryland statutory claims must be dismissed.

The second choice of law analytical path focuses on the well known principle of *lex loci delicti*, which operates both in Maryland and Virginia. Given the contractual choice of law provisions resolve the choice of law issue, it is unnecessary to consider the *lex loci delicti*

13

doctrine. Yet, as a matter of completeness, it is appropriate to note that even if the contractual

choice of law provisions did not apply, consideration of *lex loci delicti* would not alter the result

reached here that Virginia law governs.

In those states in which it is still followed, the doctrine of *lex loci delicti* dictates that the

law of the state in which the alleged tort occurred governs the substantive rights of the parties.

*See Philip Morris, Inc. v. Angeletti*, 358 Md. 689, 745 (2000); *White v. King*, 244 Md. 348, 352

(1966). Both Maryland and Virginia law recognize the doctrine of *lex loci delicti*, even as other

states have rejected the doctrine in favor of a "most significant relationship" test.[15] Yet,

importantly, Maryland and Virginia courts differ in their discussion of the doctrine in one critical

respect: courts applying Virginia law generally define the place of the tort as being where "the

last event necessary to make an [actor] liable for an alleged tort takes place,"[16] whereas, under

Maryland law, "the place of the tort is considered to be the place of injury," namely "the place

where the injury was suffered, not where the wrongful act took place."[17] To be sure,

---

[15] *See White*, 244 Md. at 352 (noting Maryland's decision to apply *lex loci delicti* despite its rejection by courts in other states); *McMillan v. McMillan*, 219 Va. 1127, 1129 (1979) (rejecting the "most significant relationship test" in favor of the traditional *lex loci delicti* analysis). A recent survey of states' choice of law approaches revealed that only ten states adhere to the traditional *lex loci delicti* choice of law analysis for tort claims. Symeon C. Symeonides, *Choice of Law in the American Courts in 2010: Twenty-Fourth Annual Survey*, 59 Am. J. Comp. L. 303, 330 (2011).

[16] *Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986) (quoting *Miller v. Holiday Inns, Inc.*, 436 F. Supp. 460, 462 (E.D. Va. 1977)).

[17] *Philip Morris*, 358 Md. at 745-46 (quoting with approval *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 511 (4th Cir. 1986) (applying Maryland law)); *Frericks v. General Motors Corp.*, 274 Md. 288, 296 (1975); *but see Cremi v. Brown*, 955 F. Supp. 499 (D. Md. 1997) (construing Maryland law and holding that the place where a fraud occurred for choice of law purposes is the place where the misrepresentation occurred, not where the loss was suffered). Although the court in *Cremi* identified the pertinent precedent from the Maryland courts recognizing the place where an injury is suffered rather than the place where the misconduct occurred as determinative for the choice of law, *Cremi* nevertheless held that the place of the misrepresentation governed

distinguishing Maryland's analytical approach from Virginia's is difficult in practice, and the Fourth Circuit's own cases are not entirely clear concerning the appropriate construction of *lex loci delicti* under Maryland law.[18]  Nevertheless, consistent Maryland court precedent construing the doctrine has held that the place where the injury was suffered, and not where the wrongful act occurred, is determinative of the place of the tort. Therefore, because Maryland's choice of law principles apply here, the governing law—absent the contractual choice of law provisions— would be the law of the state in which the injury was suffered.

No Maryland court has analyzed how to determine where an injury is suffered for the purposes of a fraudulent conveyance claim.[19]  Nevertheless, MainStreet relies on *Terry v. June,* 420 F. Supp. 2d 493 (W.D. Va. 2006), an opinion decided under Virginia choice of law rules. MainStreet's reliance on *Terry* is misplaced.  In *Terry,* the court held that the *lex loci delicti* for a fraudulent conveyance claim is the law of the forum in which the fraudulent conveyance was completed. *Id.* at 504.  Thus, *Terry* held that the last step in the conveyance—namely receipt of the conveyed assets by the third party—was the final act that determined the choice of law.  *Id.*

the analysis, citing "common sense" without elaboration. *Id.* at 524.  Because *Cremi* does not align with Maryland courts' consistent interpretation of *lex loci delicti, Cremi* is not followed here.

[18] In *Johnson,* the Fourth Circuit noted that under Maryland law, "[t]he place of injury is the place where the injury was suffered, not where the wrongful act took place." 785 F.2d at 511. Four years later, in *Farwell v. Un,* 902 F.2d 282 (4th Cir. 1990), the Fourth Circuit indicated— also under Maryland law—that "the locus of a tort for choice of law purposes is that where the last act required to complete it occurred." *Id.* at 286.  For support, the Fourth Circuit in *Farwell* cited its earlier precedent in *Johnson,* notwithstanding the fact that *Johnson* did not rely on a "last act" construction of *lex loci delicti.*  In any event, it does not appear that the result in either *Farwell* or *Johnson* would have been altered by adhering more strictly to one construction over the other, which may explain why little attention was apparently given to the distinction, if any, between the "last act" and "where the injury was suffered" approaches to the application of the *lex loci delicti* doctrine.

[19] As noted *supra* in note 17, one federal district court case in Maryland has applied the *lex loci delicti* doctrine to a fraud claim, but for the reasons already stated in that note, that case is not followed here.

15

For example, for a fraudulent conveyance by wire transfer, the *lex loci delicti* would be the state in which the receiver's bank account was located. *Id.* The opinion in *Terry* is unpersuasive here, however, because Virginia's "last act" approach is not the prevailing construction of *lex loci delicti* in Maryland. *See Philip Morris*, 358 Md. at 745-46.

In looking solely to the injury inflicted by a fraudulent conveyance, defendants assert that the injury occurs where the creditor is located because it is the creditor that suffers when the debtor becomes insolvent. Thus, because MainStreet is located in Virginia, defendants argue Virginia law governs. MainStreet, on the other hand, contends that the relevant legal injury imposed by a fraudulent conveyance is an injury to the debtor, having been left insolvent by the transfer. While it is true that, in some sense, a fraudulent conveyance imposes a self-inflicted wound on the debtor, MainStreet's view of the injury ignores the central fact that it is the creditor, not the debtor, that may claim injury and seek redress in a fraudulent conveyance action. It is appropriate, therefore, to consider the pertinent injury for choice of law purposes in a fraudulent conveyance action to be the injury to the plaintiff creditor. Because creditor here, MainStreet, is located in Virginia, Virginia law governs MainStreet's fraudulent conveyance claims.

In sum, whether the choice of law analysis is governed by the closing documents' contractual choice of law provisions or by the doctrine of *lex loci delicti*, the result is the same: Virginia law governs MainStreet's claims. Accordingly, MainStreet's fraudulent conveyance claims brought under Maryland statutory law—namely Counts I-IV of the amended complaint— must be dismissed. Therefore, only two claims remain for summary judgment analysis, namely the common law actual and constructive fraud claims, both of which must be analyzed under Virginia law.

16

## III.

The summary judgment standard is too well-settled to require elaboration here. In essence, summary judgment is appropriate under Rule 56, Fed. R. Civ. P., only where, on the basis of undisputed material facts, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Importantly, to defeat summary judgment the non-moving party may not rest upon a "mere scintilla" of evidence, but must set forth specific facts showing a genuine issue for trial. *Id.* at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Thus, the party with the burden of proof on an issue cannot prevail at summary judgment on that issue unless that party adduces evidence that would be sufficient, if believed, to carry the burden of proof on that issue at trial. *See Celotex*, 477 U.S. at 322.

## IV.

The elements of both actual and constructive fraud are well settled under Virginia law. To prove actual fraud, a plaintiff must prove by clear and convincing evidence (i) that the defendant made a knowing and intentional false representation of a material fact, and (ii) that the plaintiff suffered damage as a result of reasonable reliance on that misrepresentation. *Davis v. Marshall Homes, Inc.*, 265 Va. 159, 165 (2003). Similarly, to prevail on a constructive fraud claim, a plaintiff must show by clear and convincing evidence (i) that the defendant negligently or innocently made a false representation of material fact, and (ii) that the plaintiff suffered damage as a result of his reasonable reliance on that misrepresentation. *SuperValu, Inc. v. Johnson*, 276 Va. 356, 367 (2008).

A brief review of the record makes clear that genuine disputes of fact exist as to MainStreet's actual and constructive fraud claims. For example, MainStreet contends that defendants and their agents misrepresented that all of NWC's assets would be transferred to NEC prior to closing, which led MainStreet to conclude that NEC would have sufficient collateral to

17

cover its loan obligations to MainStreet.  In support of this contention, MainStreet cites the sworn declaration of MainStreet's loan officer and the emails exchanged between the loan officer and defendants' agents.  Defendants argue that the bill of sale provided just before closing put MainStreet on notice that not all of NWC's assets would be transferred to NEC inasmuch as MainStreet could have—and in defendants' view, should have—carefully scrutinized the bill of sale side-by-side with previously-disclosed documents listing NWC's total assets.  MainStreet disputes this view of the bill of sale, contending instead that the bill of sale was understood to be merely a confirmation that all assets had been transferred.  Whether defendants in fact misrepresented the asset transfers, and whether MainStreet was reasonable in relying on defendants' prior representations rather than scrutinizing the bill of sale more closely, are genuine factual disputes that must be put to a jury.

Additionally, MainStreet contends that defendants misrepresented that several projects had been awarded to NEC prior to closing even though, in reality, NEC had not been awarded any new projects in several months.  Defendants counter that MainStreet was unreasonable in relying on references to "awarded" projects without asking for a definition of "awarded" or inquiring as to the expected revenue of the projects.  Just as with the representations concerning the transfer of assets, the summary judgment record reflects a genuine dispute of fact as to whether defendants intentionally misled MainStreet into concluding that NEC had several revenue-generating projects pending when the reality was to the contrary.

These examples are representative, but not exhaustive, of the genuine factual disputes presented by this summary judgment record.  Accordingly, summary judgment must be denied on the common law fraud claims.

In sum, defendants' motion for summary judgment must be granted in part and denied in part. Because the choice of law analysis dictates that Virginia law governs MainStreet's claims, the Maryland statutory fraudulent conveyance claims must be dismissed. Yet, because genuine disputes of material fact exist as to the common law actual and constructive fraud claims, the fraud claims cannot be resolved on summary judgment.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

Alexandria, Virginia
June 8, 2011

T. S. Ellis, III
United States District Judge